# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

     Plaintiff,

vs.                                           No. CR 11-2860 JB

KEITH MICHAEL COURTNEY,

     Defendant.

## MEMORANDUM OPINION AND ORDER

**THIS MATTER** comes before the Court on: (i) the Defendant's Third Motion in Limine to Exclude Evidence of Unrelated Loans, filed March 7, 2013 (Doc. 63)("3rd MIL"); (ii) the Defendant's Fifth Motion in Limine to Exclude Evidence of Vista Studios Investments, filed March 7, 2013 (Doc. 65)("5th MIL"); and (iii) the Defendant's Sixth Motion in Limine to Exclude proposed Exhibits 24 and 37 through 40, filed March 7, 2013 (Doc. 66)("6th MIL").   The Court held a hearing on March 15, 2013.   The primary issues are: (i) whether the Court, under rules 401 and 402 of the Federal Rules of Evidence, should exclude exhibits that Plaintiff United States of America intends to introduce at the trial related to loans and alleged investments that are not directly related to the properties, the alleged fraudulent sales of  which are the basis for the charges against Defendant Keith Michael Courtney, because the loans and investments are irrelevant; and (ii) whether the Court should, under rule 403 of the Federal Rules of Evidence, exclude the exhibits, because the danger of unfair prejudice and confusion of the issues that the evidence presents substantially outweighs any of the exhibits' probative value.   The Court will deny the 3rd MIL, the 5th MIL, and the 6th MIL.   The United States' theory of the case is that the alleged fraudulent sale of the property located at 4400 Oxbow Trail NW, Albuquerque, New

Mexico, the fraudulent sale of which is the basis for Counts 1 and 2 of the Indictment, filed Nov. 11, 2009 (Doc. 2), against Courtney, was part of a scheme that Courtney devised or in which he participated to acquire funds that he invested in Vista Studios, a planned movie studio in Santa Fe, New Mexico.   The Court concludes that the exhibits that Courtney's motions in limine seek to exclude evidence Courtney's involvement in investing in Vista Studios, and evince his motivation in participating in or arranging the fraudulent sale of 4400 Oxbow Trail.   Specifically, the loans that Rhonda Smith, the straw buyer of 4400 Oxbow Trail provided to Courtney, which Courtney's 3rd MIL seeks to exclude, show Courtney's connection to investing in Vista Studios, and also connect Smith and 4400 Oxbow Trail to those properties.   With regard to the 5th MIL and the 6th MIL, the exhibits show that Courtney immediately used the proceed money from 4400 Oxbow Trail's sale to invest in Vista Studios and to pay off a debt that he owed to a person to whom he provided a promissory note in exchange for her investment in Vista Studios, and are thus relevant to Courtney's motive in the alleged fraudulent sale of 4400 Oxbow Trail.   Finally, the Court concludes that, given that the United States' theory of the case is that Courtney sold 4400 Oxbow Trail as part of a larger scheme in which he would build properties, sell them to straw buyers, and use the sales proceeds to invest in other properties, any danger of prejudice or confusion of the issues which this evidence presents does not substantially outweigh its probative value.

## **FACTUAL BACKGROUND**

Courtney was part owner of Black Diamond Construction Company, Veritas Mortgage Company, and Polaris Realty.   See Indictment ¶ 1, at 1.   Jason Johns, Courtney's co-Defendant, was a loan officer with Veritas Mortgage Company.   See Indictment ¶ 2, at 1.   The Indictment alleges that Courtney and Johns, "with intent to defraud, knowingly and unlawfully devised and intended to devise a scheme and artifice to defraud the lending institutions, and to obtain money,

funds and other property from the Lending Institutions by means of materially false and fraudulent pretenses."   Indictment ¶ 5, at 1-2.

The purpose of the scheme and artifice is alleged to be obtaining loans from the lending institutions by inducing them to lend funds for the purchase of residential properties through the use of materially false representations, and in so do doing, to pay off existing mortgages and construction loans and to fraudulently obtain a portion of those funds.   See Indictment ¶ 6, at 2. As part of this alleged scheme, the Indictment alleges that Black Diamond built residences at 4400 Oxbow Trail and at 17 Camino Sabañero, Santa Fe, New Mexico, the title owner of which was Courtney's mother, and she was also named on the mortgages and construction loans for these properties.   See Indictment at 6(a), at 2.   When Black Diamond finished construction of the houses at 4400 Oxbow Trail and 17 Camino Sabañero, Courtney and Johns contacted straw buyers with good credit and solicited their participation in the scheme by representing that Courtney and Johns would use the straw buyers' names and credit to purchase these houses in exchange for $5,000.00 of credits or payments per house to the straw buyers once the houses were resold.   See Indictment ¶ 6(b), at 2-3.   Courtney told the straw buyers that he needed their credit information only to make the initial purchases, that he would pay the mortgage payments, and that the straw buyers would not be responsible for the payments on the mortgage loans.   See Indictment ¶ 6(c), at 3.

Johns filled out the straw buyers' loan applications and falsified material information to ensure that they would qualify for the mortgages.   See Indictment ¶ 6(d), at 3.   Johns then provided the applications to the straw buyers to obtain their signatures and sent the completed applications to the lenders.   See Indictment ¶ 6(e), at 3.   Before the closings, Courtney provided down payments to the title companies for the purchase of the homes, although the HUD-1 forms

identified the straw buyers as the source of the down payments.[1]   See Indictment ¶ 6(f), at 3. After the closings, Courtney made some of the mortgage payments on the loans for 4400 Oxbow Trail and 17 Camino Sabañero, but ultimately stopped; the houses then went into foreclosure. See Indictment ¶ 6(g), at 3-4.

Starting apparently as early as July, 2006, Courtney began investing in Vista Studios, which was a project to use existing buildings in a location near Santa Fe to provide a training facility for movie technicians.   See Cashier's Check from Keith Michael Courtney to Vista Studios Inc. at 1 (dated July 5, 2006), filed March 7, 2013 (Doc. 65-1); United States' Response to Defendant's Fifth and Sixth Motions in Limine to Exclude Evidence of Vista Studios Investments (Docs. 65 and 66) at 1, filed March 13, 2013 (Doc. 78)("Vista Studios Response").   On or about November 11, 2006, Johns executed a promissory note in favor of Joelle E. Nisolle, which lists the borrower as "Keith Michael Courtney and/or Jason Johns," and states that, "[f]or value received," promises to pay to Nisolle $300,000.00.   Promissory Note at 1 (dated November 11, 2006), filed March 7, 2013 (Doc. 66-1).   Specifically, under the heading "Payment Due," the Promissory Note provides that the majority of the payment will be due when the funding for 4400 Oxbow Trail is made, and the rest due on November 27, 2006: "$244,496.30 and $12,967.50 ($257,471.80) due upon the funding of Lot 163, Oxbow North Subdivision, Bernalillo County, NM.   The balance of $42,528.20 will be due by the 27th of November, 2006."   Promissory Note at 1.

Courtney's mother as the seller and Rhonda Smith as the buyer entered into a purchase agreement on or about November 1, 2006, for $997,500.00 for 4400 Oxbow Trail.   See

---

[1] "The HUD-1 Settlement Statement is a standard form in use in the United States of America which is used to itemize services and fees charged to the borrower by the lender or broker when applying for a loan for the purpose of purchasing or refinancing real estate."   HUD-1 Settlement Statement, Wikipedia.org, http://en.wikipedia.org/wiki/HUD-1_Settlement_Statement (last visited Aug. 29, 2013).

Indictment ¶ 6(h)(1), at 4.   Johns falsely stated that Smith was purchasing the house as a primary residence.   See Indictment ¶ 6(h)(2), at 4.   On or about November 1, 2006, Courtney gave Smith a letter in which he said that he was liable for making the mortgage payments on the loans obtained for 4400 Oxbow Trail.   See Indictment ¶ 6(h)(3), at 4.   On or about November 10, 2006, Courtney provided a cashier's check in the amount of $56,955.69 to the title insurance company, which the HUD-1 Settlement Statement identifies as cash from the borrower to the seller.   .   See Indictment ¶ 6(h)(5), at 4.   On or about November 13, 2006, in reliance on the representations that Courtney and Johns made, Plaza Home Mortgage, Inc., provided approximately $960,022.50 in loan proceeds to the title company to fund the transaction.   See Indictment ¶ 6(h)(6), at 4-5.

Vista Studios received an investment of $9,997.00 from Courtney on November 13, 2006. See Vista Studios Wire Transfers on November 13, 2006 at 1, filed March 7, 2013 (Doc. 65-3). Also on November, 13, 2006, Nisolle made three wire transfers to Vista Studios totaling $289,991.00.   See Vista Studios Wire Transfers on November 13, 2006 at 1.   On November 14, 2006, Courtney wired approximately $244,496.20 of the loan proceeds from 4400 Oxbow's sale to Nisolle.   See Indictment ¶ 6(h)(7), at 4.

## PROCEDURAL BACKGROUND

An eight-page Indictment was filed on November 9, 2011.   The federal grand jury charged Courtney and Johns with three counts of wire fraud, and aiding and abetting, associated with transactions that involve complex financial instruments, transactions, records, and activity over the course of nearly one calendar year.   See Indictment at 1-7.   The Indictment also included a separate forfeiture count.   See Indictment at 7-8.

### 1.    Courtney's 3rd MIL.

Courtney, under the Fourth and Fifth Amendments to the United States Constitution and

the Federal Rules of Evidence moves the Court to exclude testimony and proposed exhibits related to loans that Smith made to Courtney or Black Diamond Construction.  See 3rd MIL at 1. Courtney explains that in the United States' proposed exhibit list for the trial, the United States included five promissory notes related to "four investment loans provided by Rhonda Smith to Keith Michael Courtney during 2006 and 2007 and one loan provided by Rhonda Smith to Black Diamond Construction in 2007."  3rd MIL ¶ 1, at 1.  Courtney adds that the United States also includes in its exhibit list two checks that Smith wrote to Courtney.  See 3rd MIL ¶ 2, at 2.

Courtney argues that these loans that Smith provided to Courtney are "entirely irrelevant" and that the Court should exclude them under rule 402, because he "is not charged with any wrongdoing in connection with these investment loans," as he is "charged with allegedly committing fraud in regards to two entirely separate mortgage transaction."  3rd MIL ¶ 3, at 2. He argues that the Court should exclude the evidence under rule 403, because, even if this evidence has some probative value, the United States will likely use this evidence to show that Courtney "may have defaulted on other loans, it is clearly unduly prejudicial and will only inflame the jury."  3rd MIL ¶ 4, at 2-3.  Courtney contends further that, "because Defendant is not charged with any criminal conduct in regards to those transactions, it will only serve to confuse the jury."  3rd MIL at ¶ 4, at 3.  According to Courtney, the Court should also exclude this evidence as improper character evidence, because "this is evidence of other acts which falls under the umbrella of Rule 404."  3rd MIL ¶ 5, at 3.

    2.    **The United States' Response to Defendant's Third Motion *in Limine* to Exclude Evidence of Unrelated Loans, filed March 13, 2013 (Doc. 81)("MIL Response").**

On March 13, 2013, the United States filed the MIL Response.  The United States asserts that Smith was the "straw buyer" of 4400 Oxbow, the transactions for which are the basis for

Counts 1 and 2 of the Indictment, and that, "[a]t the time she signed the loan documents in November 2006, [she] falsely stat[ed] that she intended 4400 Oxbow to be her primary residence." MIL Response ¶ 1, at 2.   The United States explains that Smith will testify that Courtney told her she would not have to pay any closing costs or mortgage payments on 4400 Oxbow, because he would pay those costs, and did so from January 2007, through November 2007.   See MIL Response ¶ 1, at 2.   According to the United States, Smith also, at Courtney's request, loaned Courtney $150,000.00 through February 2007, "for his investment in the Vista Studios project." MIL Response ¶ 2, at 2.   In relation to these loans specifically, the United States asserts that Smith will testify:

> [T]o raise the money to lend the defendant, reflected in the promissory notes in Government's Exhibits Nos. 12, 13, 14, and 16, she raised the money by 1) taking out a second mortgage on the house Black Diamond was building for her in Albuquerque; 2) applying for a Small Business Administration loan based on a side business she had at the time; and 3) re-financing two rental homes she owned, through Veritas Mortgage, giving the equity to the defendant. She expected to be repaid the loan amounts, with interest. Ultimately, she received a few payments, but the majority of the loans were not repaid. In addition to those payments, the defendant made mortgage payments for Smith on 4400 Oxbow from January 2007 through November 2007 in the total approximate amount of $51,344.56. However, by early 2008, Smith will testify, the defendant stopped making the mortgage payments and stopped paying her wages.

MIL Response ¶ 2, at 2-3.   The United States explains that, "[a]lthough Smith's loans to the defendant are not directly related to the crimes with which he is charged, they are further evidence of his involvement in the studio investment, which was the reason for the sale of 4400 Oxbow." MIL Response ¶ 3, at 3.   The United States asserts that Courtney had "considerable involvement in the" Vista Studios investment, "[s]ome of which may have come from the loans he obtained from Smith."   MIL Response ¶ 3, at 3.   The United States thus asks the Court to deny Courtney's 3rd MIL.

3.      **Courtney's 5th MIL**.

In the 5th MIL, Courtney moves the Court, under the Fifth and Fifteenth Amendments, and under the Federal Rules of Evidence, to prohibit the United States from presenting evidence of any investments by Courtney or by others in Vista Studios.   See 5th MIL at 1.   Courtney asserts that, based on the United States' proposed exhibit and witness list, he believes that it intends to introduce evidence "relating to a failed movie studio project near Santa Fe, New Mexico, in which Defendant allegedly invested significant monies personally and through recruitment of other investors.   The project was identified as Vista Studios."   5th MIL ¶ 1, at 1.   Courtney argues that "[t]he Vista Studios project is, at best, only tangentially connected to the alleged transactions in this matter," as the only connections is that he, along with other investors, invested in Vista Studios before it failed.   5th MIL ¶ 2, at 2.   Courtney asserts that the United States intends to offer at least four exhibits and at least three witnesses to provide evidence about Vista Studios. See 5th MIL ¶¶ 3-4, at 2.

Courtney contends that his "outside investments do not make any fact of consequence in this matter any more or less probable.   They are irrelevant pursuant to Rule 401 and therefore inadmissible pursuant to Rule 402."   5th MIL ¶ 5, at 2 (emphasis in original).   He further contends:

> [N]one of the above has relevance to the allegations in this case and will only serve
> to confuse the jury, particularly given that others involved in Vista Studios were
> possibly subject to investigation.   It will mislead the jury into believing that
> Defendant was involved in illegal activity with the individuals promoting Vista
> Studios.

5th MIL ¶ 6, at 2-3 (emphasis in original).   Courtney therefore asks that the Court exclude the evidence under rule 403.   See 5th MIL ¶ 6, at 3.

-8-

4.      **Courtney's 6th MIL**.

In the 6th MIL, Courtney moves the Court under the Fifth and Fourteenth Amendments, and under the Federal Rules of Evidence, to exclude the United States' Proposed Exhibits Nos. 24, 37, 38, 39, and 40, which relate to a Promissory Note that Johns executed, and to communications between John and others -- not including Courtney -- concerning the Promissory Note.   See 6th MIL ¶ 1, at 1.   Courtney explains that the United States' Proposed Exhibit No. 24 is a three-page promissory note, which names Johns and Courtney as borrowers, but he points out that only Johns signed the note.   See 6th MIL ¶ 2, at 1.   According to Courtney, Proposed Exhibits Nos. 37 through 40 are electronic mail communications between Johns and Joelle Nisolle, the holder of the Note, and he points out that his name is never mentioned in the electronic mail transmissions, nor was he a party to the communications.   See 6th MIL ¶ 3, at 2.

Courtney argues: "[T]hese exhibits are irrelevant because he is not a party to them and they do not consist of actions in furtherance of any alleged conspiracy.   Accordingly, they are inadmissible pursuant to Rules 402 and 404."   6th MIL ¶ 4, at 2.   Courtney also argues: "[A]dmission of these exhibits and testimony relating to their contents will confuse the jury because Defendant is not on trial for any actions relating to the Johns' Promissory Note.   Thus, they are inadmissible pursuant to Rule 403."   6th MIL ¶ 5, at 2.   Courtney therefore asks that the Court exclude pre-trial Proposed Exhibits Nos. 24 and 37-40.   See 6th MIL at 2.

5.      **The United States' Vista Studios Response**.

In its Vista Studios Response, the United States argues that the Court should deny the 5th MIL and the 6th MIL, because they both relate to Courtney's investment in Vista Studios, and because it is the United States' position that "the sale of 4400 Oxbow (Counts 1 and 2) to a straw buyer was predicated on the defendant's need to raise funds for his investment in a project known

as Vista Studios."   Vista Studios Response ¶ 1, at 1.   The United States asserts:

> The defendant started investing in the project in about May 2006 and, between May 2006 and December 2006, wired significant amounts of funds to Vista Studios from his personal bank account. The sale of 4400 Oxbow closed on about November 10, 2006, and title company documents show that the defendant directed the sales proceeds of $244,446.30 were to be wired to one Joelle Nisolle.

Vista Studios Response ¶ 1, at 1.   The United States explains that it will offer testimony that Nisolle was someone who "occasionally made short-term loans" to Courtney and "that she did so specifically in connection with 4400 Oxbow."   Vista Studios Response ¶ 1, at 1-2.   The United States adds that "[t]he sales proceeds that were wired to Nisolle, and not to the defendant's mother who was the named seller of the property, were in repayment of one of her short-term loans to him. The loan from Nisolle took the form of her wiring about $290,000.00 to Vista Studios."   Vista Studios Response ¶ 1, at 2.

In relation to the exhibits to which Courtney objects in his 5th MIL, the United States explains that Proposed Exhibit No. 23 shows Vista Studios' receipt of funds that Nisolle and Courtney wired on November 13, 2006, which the United States contends that Nisolle wired to Vista Studios as a loan to Courtney, and in repayment for which Courtney wired Nisolle the sales proceeds from 4400 Oxbow.   See Vista Studios Response ¶ 3, at 3.   As to Proposed Exhibit No. 45, the United States asserts that this exhibit is also relevant, because it is an electronic mail transmission in which Johns is seeking a loan and offering the expected proceeds of 4400 Oxbow's sale as repayment.   See Vista Studios Response ¶ 4, at 3.   In relation to Proposed Exhibits Nos. 10, 22, 49, and 56, the United States asserts:

> Exhibits Nos. 10 and 22 show other amounts invested by the defendant in Vista Studios, and Exhibit No. 49 is a promise by Vista Studios to repay the defendant over $700,000.00 for his investment. Although these exhibits do not appear to be directly linked to the sale of 4400 Oxbow, the fact that the defendant was involved in this investment is relevant to show why he would sell 4400 Oxbow to a straw

-10-

buyer. The extent of his involvement as shown in the total investments is offered to rebut any claim that only Jason Johns was involved in borrowing $290,000.00 from Joelle Nisolle. The loan was repaid by the defendant with the sales proceeds from 4400 Oxbow. Only the defendant could direct the sales proceeds to Nisolle, away from the seller of the property. Jason Johns had no ability to send the sales proceeds to Nisolle. More importantly, it was the defendant who had invested heavily in Vista Studios before November 2006 and so had the motivation to borrow additional funds from Nisolle and repay them by selling 4400 Oxbow to a straw buyer. Government's Exhibit 56, attached hereto, is a summary of all the wires from the defendant's personal checking account to Vista Studios from July 2006 to March 1, 2007. This exhibit includes the cashier's check which is also Exhibit No. 10. The United States will withdraw Exhibits Nos. 10 and 22 and propose Exhibit No. 56 to show the extent of the defendant's involvement in the investment to rebut any claim that he was not involved in the specific investment of the $290,000.00.

Vista Studios Response ¶ 5, at 3-4.

The United States explains that the Proposed Exhibits that Courtney seeks to exclude in his 6th MIL "related to the loan from Joelle Nisolle and repayment through the sale of 4400 Oxbow. As such, they are directly related to the charges in Counts 1 and 2." Vista Studios Response ¶ 6, at 4. It points out that Proposed Exhibit No. 24 -- the Promissory Note -- "is a promissory note from 'Keith Michael Courtney and/or Jason Johns,'" and that the rest of the documents in Proposed Exhibit Nos. 37 through 40 relate to paying off the note. Vista Studios Response ¶ 6, at 4-5.

With regard to Courtney's 6th MIL, the United States asserts that, "[i]nasmuch as the exhibits [that Courtney seeks to exclude] are directly related to the sale of Oxbow 4400, charged in Counts 1 and 2, they are relevant to the crimes charged." Vista Studios Response ¶ 7, at 5-6. According to the United States:

Although the exhibits do not contain the defendant's signature or were not sent by him, he and co-defendant Jason Johns are charged with aiding and abetting, in violation of 18 U.S.C. § 2. It is not necessary for the government to prove that the defendant committed all the acts so long as he knew and intended for them to occur. He certainly knew that Nisolle had sent funds to Vista Studios, and that he repaid her with sales proceeds from Oxbow. The defendant used his Power of Attorney to direct the sales proceeds to Joelle Nisolle. This is direct evidence of his knowledge

of and involvement in the loan from Nisolle that went to Vista Studios for his benefit.

Vista Studios Response ¶ 7, at 5-6.

### 6.    The March 15, 2013, Hearing.

At the hearing on the motions in limine, Courtney explained that the arguments regarding the 3rd MIL, 5th MIL, and the 6th MIL are "essentially the same."   Transcript at 10:23-24 (taken March 15, 2013)(Linnenburger)("Tr.").[2]   Courtney understands that the United States' position in relation to the 5th and 6th MIL is that "the Government is seeking to introduce transfers and movement from Mr. Courtney to the folks in charge of [the Vista Studios] project in a sense to show what was done with the proceeds of the alleged fraud in this case."   Tr. at 11:9-12 (Linnenburger).   Similarly, in relation to the 3rd MIL, Courtney stated that he understands the United States intends to introduce evidence regarding the loans that Smith made to Courtney to show what Courtney did with the proceeds of the sale of 4400 Oxbow Trail.   See Tr. at 11:13-24 (Linnenburger).   He argued that "what was done with the money after . . . the fact is irrelevant to whether or not a crime itself was committed".   Tr. at 11:25-12:3 (Linnenburger).

The Court asked Courtney why this evidence showing what he did with the proceed money from 4400 Oxbow Trail's sale is not relevant to Courtney's motive in allegedly engaging in fraud in connection with the property's sale.   See Tr. at 12:4-7 (Court).   Courtney conceded that, if this evidence is "at all relevant it would be relevant in that way."   Tr. at 12:9-11 (Linnenburger). He argued, however, that, because Johns only and not him was party to the evidence that he seeks to exclude in the 5th MIL and the 6th MIL, and because Courtney is not charged with any criminal conspiracy, the evidence is not relevant to an issue at trial.   See Tr. at 12:12-24 (Linnenburger).

---

[2] The Court's citations to the transcript of the hearing refer to the court reporter's original, unedited version.   Any final transcripts may contain slightly different page and/or line numbers.

In response to the question whether it is relevant to the aiding-and-abetting count with which Courtney is charged, he responded that, to admit this evidence in relation to aiding and abetting, "there would need to be a rather strong showing that Mr. Courtney was in on that part of it."   Tr. at 13:2-6 (Linnenburger).

The Court asked Courtney whether this evidence may be relevant and particularly probative if the United States puts on a case of fraud against Johns, and then, when Johns is on the stand, having Johns testify that Courtney aided and abetted his fraud.   See Tr. at 13:7-18 (Court). Courtney responded that he agrees that the United States may properly proceed by focusing on the aiding and abetting charge at trial, but reiterated his contention that proceeding in that manner does not change his argument that "once those funds were transferred from the lenders to the title companies . . . the crime itself is essentially done."   Tr. at 14:14-15:2 (Linnenburger)(citing United States v. Redcorn, 528 F.3d 727 (10th Cir. 2008)).   The Court stated that it may be true that the elements of the crime may have been complete before Courtney distributed the sales proceeds.   The Court asked, however, whether there is a distinction between the elements of a crime and evidence relevant to the crime, and whether Courtney's conduct related to the proceeds of the sale of 4400 Oxbow Trail is admissible as it falls into the latter category of evidence relevant to the crime.   See Tr. at 15:7-14 (Court).   Courtney responded that, while it may be true that certain conduct after the crime is relevant, "the difference is that for this specific subsequent act being the utilizing the proceeds in whatever way, you know, they deemed fit, that that particular act is not relevant to the crime itself."   Tr. at 15:15-19 (Courtney)(citing United States v. Redcorn, 528 F.3d at 727).

In relation to all of the motions in limine, Courtney asserted that, "if we . . . fully delve into all of Mr. Courtney's personal finances and what other funds may have been coming in," "then we

may be getting into trials within trials."   Tr. at 16:4-10 (Linnenburger).   Courtney contended that

any relevance these loans may have is attenuated and that "the government has, in a sense, alluded

to that" in its MIL Response, where it asserts that some of the funds in Courtney's Vista Studies

account "may have" come from Smith's loans.   Tr. at 17:2-9 (Linnenburger).

The United States contended that "the [V]ista [S]tudios investment[,] while there was

nothing wrong with it as an investment, . . . provided the . . . motive for the sale of 4400 [Oxbow

Trial] in November 2006."   Tr. at 18:1-7 (Higgins).   It asserted that Smith's loans to Courtney

and checks to him provided Courtney the funds to invest in Vista Studios, and that using her as the

straw buyer was part of that overall transaction.   See Tr. at 18:7-16 (Higgins).   The United States

asserted that these loans connect Courtney to 4400 Oxbow, which, because Johns' name is signed

to the documents, is important to the United States' case.   See Tr. at 18:25-19:13 (Higgins).   It

also asserted that "it provides a background, it provides a context for why the sale of 4400 to a

straw buyer, why it occurred[,] why it was necessary at least from their point of view."   Tr. at

19:6-16 (Higgins).

## LAW REGARDING RELEVANCY OF EVIDENCE

"The rules of evidence contemplate the admission of relevant evidence, and the exclusion

of irrelevant and potentially prejudicial evidence."   Train v. City of Albuquerque, 629 F. Supp. 2d

1243, 1247 (D.N.M. 2009)(Browning, J.)(citing Fed. R. Evid. 401, 402, 403).   "Relevant

evidence is evidence that has a tendency to make the existence of any fact that is of consequence to

the determination of the action more probable or less probable than it would be without the

evidence."   United States v. Gutierrez-Castro, No. CR 10-2072 JB, 2011 WL 3503321, at *3

(D.N.M. Aug. 6, 2011)(Browning, J.)(citing Fed. R. Evid. 401 ("Evidence is relevant if: **(a)** it has

any tendency to make a fact more or less probable than it would be without the evidence; and **(b)**

the fact is of consequence in determining the action.")).   "Rule 401 contains a low threshold for

relevance, because '[a]ny more stringent requirement is unworkable and unrealistic.'"   United

States v. Goxcon-Chagal, 885 F. Supp. 2d 1118, 1162 (D.N.M. 2012) (Browning, J.)(quoting Fed.

R. Evid. 401 advisory committee's note).   Irrelevant evidence, or that evidence which does not

make a fact of consequence more or less probable, however, is inadmissible.   See Fed. R. Evid.

402 ("Irrelevant evidence is not admissible.").

## LAW REGARDING RULE 403

Rule 403 provides: "The court may exclude relevant evidence if its probative value is

substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing

the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative

evidence."   Fed. R. Evid. 403.   Under rule 403, the trial court must weigh the proffered

evidence's probative value against its potential for unfair prejudice.   See United States v. Record,

873 F.2d 1363, 1375 (10th Cir. 1989).   "[I]t is only unfair prejudice, substantially outweighing

probative value, which permits exclusion of relevant matter [under rule 403]."   United States v.

Pettigrew, 468 F.3d 626, 638 (10th Cir. 2006)(quoting United States v. Sides, 944 F.2d 1554, 1563

(10th Cir. 1991))(internal quotations omitted).   "In performing the 403 balancing, the court

should give the evidence its maximum reasonable probative force and its minimum reasonable

prejudicial value."   Deters v. Equifax Credit Info. Servs., Inc., 202 F.3d 1262, 1274 (10th Cir.

2000).   The "exclusion of evidence under Rule 403 that is otherwise admissible under the other

rules is an extraordinary remedy and should be used sparingly."   United States v. Smalls, 605 F.3d

765, 787 (10th Cir. 2010).

The decision to admit or exclude evidence pursuant to rule 403 is within the trial court's

discretion, see United States v. Lugo, 170 F.3d 996, 1005 (10th Cir. 1999), and the trial court's

discretion to balance possible unfair prejudice against probative value is broad, <u>see</u> <u>United States v. Bice-Bey</u>, 701 F.2d 1086, 1089 (4th Cir. 1983); <u>United States v. Masters</u>, 622 F.2d 83, 87-88 (4th Cir. 1980).   As the Supreme Court of the United States has noted:

> In deference to a district court's familiarity with the details of the case and its greater experience in evidentiary matters, courts of appeals afford broad discretion to a district court's evidentiary rulings . . . .   This is particularly true with respect to Rule 403 since it requires an "on-the-spot balancing of probative value and prejudice, potentially to exclude as unduly prejudicial some evidence that already has been found to be factually relevant."

<u>Sprint/United Mgmt. Co. v. Mendelsohn</u>, 552 U.S. 379, 384 (2008)(citation omitted).

Evidence is unfairly prejudicial if it makes a conviction more likely because it provokes an emotional response from the jury, or if the evidence otherwise tends to adversely affect the jury's attitude toward the defendant wholly apart from its judgment as to his guilt or innocence of the crime charged.   <u>See</u> <u>United States v. Rodriguez</u>, 192 F.3d 946, 951 (10th Cir. 1999).   "Evidence is not unfairly prejudicial merely because it is damaging to an opponent's case." <u>United States v. Caraway</u>, 534 F.3d 1290, 1301 (10th Cir. 2008)(quoting <u>United States v. Curtis</u>, 344 F.3d 1057, 1067 (10th Cir. 2003)).   Rather, "[t]o be <u>unfairly</u> prejudicial, the evidence must have 'an undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one.'"   <u>United States v. Caraway</u>, 534 F.3d at 1301 (quoting Fed. R. Evid. 403 advisory committee note)(emphasis in original).

### LAW REGARDING RULE 404(b)

Under rule 404(b), evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person to show action in conformity therewith.   <u>See</u> Fed. R. Evid. 404(b).   Rule 404(b) provides:

> **(b) Other Crimes, Wrongs, or Acts.** -- Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in

-16-

> conformity therewith.   It may, however, be admissible for other purposes, such as
> proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or
> absence of mistake or accident, provided that upon request by the accused, the
> prosecution in a criminal case shall provide reasonable notice in advance of trial, or
> during trial if the court excuses pretrial notice on good cause shown, of the general
> nature of any such evidence it intends to introduce at trial.

Fed. R. Evid. 404(b).   In other words, one cannot present evidence the relevance of which is based

on the forbidden inference: the person did X in the past, therefore he probably has a propensity for

doing X, and therefore he probably did X this time, too.   The rule, however, has a number of

"exceptions" -- purposes for which such evidence will be admissible.   Those purposes include

proving motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake

or accident.   See Fed. R. Evid. 404(b).   The Supreme Court of the United States has enunciated a

four-part process to determine whether evidence is admissible under rule 404(b).   See Huddleston

v. United States, 485 U.S. 681, 691-92 (1988).   The United States Court of Appeals for the Tenth

Circuit has consistently applied that test.

> To determine whether Rule 404(b) evidence was properly admitted we look to [a]
> four-part test . . . : (1) the evidence must be offered for a proper purpose; (2) the
> evidence must be relevant; (3) the trial court must make a Rule 403 determination
> of whether the probative value of the similar acts is substantially outweighed by its
> potential for unfair prejudice; and (4) pursuant to Fed. R. Evid. 105, the trial court
> shall, upon request, instruct the jury that evidence of similar acts is to be considered
> only for the proper purpose for which it was admitted.

United States v. Zamora, 222 F.3d 756, 762 (10th Cir. 2000)(citing United States v. Roberts, 185

F.3d 1125 (10th Cir. 1999)).   See United States v. Higgins, 282 F.3d 1261, 1274 (10th Cir. 2002);

United States v. Hardwell, 80 F.3d 1471, 1488 (10th Cir. 1996)(citing Huddleston v. United States,

485 U.S. 681, 691-92 (1988)).

Rule 404(b)'s prohibition finds its source in the common-law protection of the criminal

defendant from risking conviction on the basis of evidence of his character.   See United States v.

-17-

Dudek, 560 F.2d 1288, 1295-96 (6th Cir. 1977); 22 C. Wright & K. Graham, Federal Practice and

Procedure: Evidence § 5239, at 428, 436-37 & 439 (1991).   In United States v. Phillips, 599 F.2d

134 (6th Cir. 1979), the United States Court of Appeals for the Sixth Circuit noted, in addressing

rule 404(b)'s precepts, that the rule addresses two main policy concerns:

> (1) that the jury may convict a "bad man" who deserves to be punished not because
> he is guilty of the crime charged but because of his prior or subsequent misdeeds;
> and (2) that the jury will infer that because the accused committed other crimes he
> probably committed the crime charged.

United States v. Phillips, 599 F.2d at 136.

When bad act evidence is both relevant and admissible for a proper purpose, "the

proponent must clearly articulate how that evidence fits into a chain of logical inferences, no link

of which may be the inference that the defendant has the propensity to commit the bad act."

United States v. Morley, 199 F.3d 129, 133 (3d Cir. 1999)(alterations omitted).   The Tenth

Circuit has also stated that district courts must "identify specifically the permissible purpose for

which such evidence is offered and the inferences to be drawn therefrom."   United States v.

Youts, 229 F.3d 1312, 1317 (10th Cir. 2000)(citing United States v. Kendall, 766 F.2d 1426, 1436

(10th Cir. 1985)).   "[A] broad statement merely invoking or restating Rule 404(b) will not

suffice."   United States v. Youts, 229 F.3d at 1317.

The Tenth Circuit has recognized the probative value of uncharged, unrelated acts to show

motive, intent and knowledge, whether the acts involved previous conduct or conduct subsequent

to the charged offense, if the uncharged acts are similar to the charged crime and are sufficiently

close in time.   See United States v. Olivo, 80 F.3d 1466, 1468-69 (10th Cir. 1996)(finding that the

district court did not abuse its discretion when it admitted evidence about an event over one year

after a defendant's arrest); United States v. Bonnett, 877 F.2d 1450, 1461 (10th Cir. 1989)(holding

that evidence about events over a year after the charged conduct was not "too remote in time and unrelated to the transactions with which he was charged").   This similarity may be shown through "physical similarity of the acts or through the 'defendant's indulging himself in the same state of mind in the perpetration of both the extrinsic offense and charged offenses.'"   United States v. Queen, 132 F.3d 991, 996 (4th Cir. 1997)(quoting United States v. Beechum, 582 F.2d 898, 911 (5th Cir. 1978).   See United States v. Bonnett, 877 F.2d at 1461 ("The closeness in time and the similarity in conduct [are] matters left to the trial court, and [its] decision will not be reversed absent a showing of abuse of discretion.").   The more similar the act or state of mind, the more relevant the evidence becomes.   See United States v. Queen, 132 F.3d at 996.   Moreover, when establishing identity, although the uncharged crime must be similar to the charged offense if it is unrelated to the charged offense, it need not be identical.   See United States v. Gutierrez, 696 F.2d 753, 755 (10th Cir. 1982).

## RELEVANT LAW REGARDING WIRE FRAUD

Section 1343 of Title 18 of the United States Code makes it a federal crime to devise or intend to devise a scheme to defraud and transmit that scheme by means of wire, radio, or television communication:

> Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transmits or causes to be transmitted by means of wire, radio, or television communication in interstate or foreign commerce, any writings, signs, signals, pictures, or sounds for the purpose of executing such scheme or artifice, shall be fined under this title or imprisoned not more than 20 years, or both. If the violation occurs in relation to, or involving any benefit authorized, transported, transmitted, transferred, disbursed, or paid in connection with, a presidentially declared major disaster or emergency (as those terms are defined in section 102 of the Robert T. Stafford Disaster Relief and Emergency Assistance Act (42 U.S.C. 5122)), or affects a financial institution, such person shall be fined not more than $1,000,000 or imprisoned not more than 30 years, or both.

18 U.S.C. § 1343.   The crime of wire fraud consists of three elements: "'Conviction for wire fraud under 18 U.S.C. § 1343 requires (1) a scheme or artifice to defraud or obtain property by means of false or fraudulent pretenses, representations, or promises, (2) an intent to defraud, and (3) use of interstate wire or radio communications to execute the scheme.'" United States v. Gordon, 710 F.3d 1124, 1147 (10th Cir. 2013)(quoting United States v. Ransom, 642 F.3d 1285, 1289 (10th Cir. 2011)).

A "'scheme to defraud focuses on the intended end result and affirmative misrepresentations are not essential; by contrast a scheme to obtain money by false pretenses, representations or promises focuses instead on the means by which the money is obtained and particular false pretenses, representations or promises must be proved.'"   United States v. Gallant, 537 F.3d 1202, 1228 (10th Cir. 2008)(quoting United States v. Cochran, 109 F.3d 660, 664 (10th Cir. 1997)).   "Fraudulent intent is required under the statute;" while "nondisclosure is not actionable as fraud absent a duty to speak"; "a misleading omission is 'actionable as fraud if it is intended to induce a false belief and resulting action to the advantage of the misleader and the disadvantage of the misled.'" United States v. Gallant, 537 F.3d at 1228 (quoting United States v. Cochran, 109 F.3d at 665).

## ANALYSIS

The Court will deny the motions in limine.   The Indictment in Counts 1 and 2 charges Courtney with two crimes related to the sale of 4400 Oxbow Trial: wire fraud, and aiding and abetting wire fraud.   Courtney contends that, because the elements of the alleged fraud had all taken place by the time that the lenders disbursed the money to the title companies, Courtney's subsequent use of any of the proceeds is irrelevant to his charges.   He adds that, even if the

evidence is relevant to any issues in his trial, the Court should exclude the evidence under rule 403, because the danger that the evidence will confuse the jury or waste time outweighs its probative value.  The United States asserts that the evidence that Courtney's motions in limine seek to exclude relates to Courtney's investments in Vista Studios, and transactions with others that facilitated some of those investments, and that his investments in Vista Studios provided him motive for the alleged fraudulent sale of 4400 Oxbow Trail.   The Court further concludes that any danger of unfair prejudice or danger of confusing the jury does not substantially outweigh the evidence's probative value.   Rule 403 does not, therefore, counsel the Court to exclude the evidence.

I.      **BECAUSE THE EVIDENCE THAT COURTNEY SEEKS TO EXCLUDE IN HIS MOTIONS IN LIMINE IS RELATED TO HIS INVOLEMENT WITH VISTA STUDIOS INVESTMENTS, WHICH THE UNITED STATES CONTENDS ESTABLISHES COURTNEY'S MOTIVE FOR THE FRAUDULENT SALE OF 4400 OXBOW TRAIL, THE COURT CONCLUDES THAT, UNDER RULE 401, THE EVIDENCE IS RELEVANT.**

The Court has in the past noted that "Rule 401 contains a low threshold for relevance, because '[a]ny more stringent requirement is unworkable and unrealistic.'"   United States v. Goxcon-Chagal, 885 F. Supp. 2d at 1162.   Indeed, to be relevant, the evidence need only have a "tendency" to make the existence of "any fact that is of consequence" in determining the case more or less probable.   Fed. R. Evid. 401.   See United States v. Gutierrez-Castro, 2011 WL 3503321, at *3 ("Relevant evidence is evidence that has a tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence.").

The United States contends that all of the evidence at issue in Courtney's 3rd MIL, 5th MIL, and 6th MIL is evidence of Courtney's involvement in the Vista Studios investment.  In

response to the 3rd MIL, for example, the United State argues that, "[a]lthough Smith's Loans to the defendant are not directly related to the crimes with which he is charged, they are further evidence of his involvement in the studio investment, which was the reason for the sale of 4400 Oxbow." 3rd MIL Response ¶ 3, at 3.   Similarly, as to one of the exhibits which Courtney seeks to exclude in his 5th MIL, the United States asserts: "Exhibit No. 23 shows the receipt of funds by Vista Studios that were wired by Joelle Nisolle and the defendant on November 13, 2006.   These amounts in turn tie to the sales proceeds wired to Joelle Nisolle by the [title company] at the direction of defendant to repay her . . . ."   Vista Studios Response ¶ 3, at 3.   Thus, all of the evidence Courtney seeks to exclude has ties to his involvement with investments in Vista Studios, which the United States argues goes to his motive to sell 4400 Oxbow Trail, the alleged fraudulent sale of which is the basis for the charges against Courtney.

Courtney's alleged motive in the fraudulent sale of 4400 Oxbow Trial is relevant.   That Courtney had a motive for selling 4400 Oxbow Trail -- to pay back both Nisolle and Smith, and to invest more of the sales proceeds in Vista Studios -- makes more probable that Courtney structured 4400 Oxbow Trail's sale fraudulently.   Specifically, that Courtney owed money on promissory notes to Nisolle, see Proposed Exhibit No. 24, and to Smith, see Proposed Exhibit Nos. 12, 13, 14, 16, 18, shows that Courtney had an incentive to sell 4400 Oxbow Trail quickly, which makes "more . . . probable" that he did so fraudulently "than it would be without the evidence" about these loans, Fed. R. Evid. 401(a).   Given that Courtney is charged with wire fraud, and aiding and abetting wire fraud, in relation to 4400 Oxbow Trail's sale, whether the sale of 4400 Oxbow Trail was fraudulent is certainly a "fact [that] is of consequence in determining this action."   Fed. R. Evid. 401(b).

Courtney cites to the Tenth Circuit's decision in United States v. Redcorn for the

-22-

proposition that, given the fraudulent activity, if any, related to 4400 Oxbow Trial's sale to Smith was completed at the time that the lenders provided the money to the title companies, what Courtney did with the proceeds afterwards is irrelevant.   In United States v. Redcorn, however, there were no facts related to debts that the defendant had to pay off or needs for a particular amount of money at a particular time.   Rather, the defendants, the company's president and the Chief Financial Officer, embezzled funds from the company and then used those embezzled funds to invest for personal gain.   See 528 F.3d at 732.   As the Tenth Circuit explained, the defendants "started removing money bit by bit" from the company, and then began "investing" the company's moneys in other companies that they controlled.   528 F.3d at 732.   Given that the defendants fraudulently obtained the money by siphoning from the company "bit by bit," the evidence of the defendants' investments to which they objected did not, therefore, provide any particular motivations that helped explain the crime, beyond the general fact that the defendant wished to make money. The Tenth Circuit held that, because the fraud with which they were charged was embezzling the company's funds, the fraud was complete once the funds were in the defendants' accounts, and how they spent them was unrelated to the scheme:

> Once the defendants deposited the funds into their personal bank accounts, they had accomplished their crime and the funds were available for their personal use.   That they chose to transfer part of their stolen money to their broker in Florida for the purpose of investments is purely incidental to the fraud; they could just as easily have decided to blow it on a luxury trip to the Ozarks.   Without a closer connection to the mechanism of their fraud, what they did with the stolen money afterward cannot itself relate to an "essential part of [the] scheme."

528 F.3d at 739 (alteration in original)(quoting United States v. Mann, 884 F.2d 532, 536 (10th Cir. 1989)).

Here, however, the exact evidence that Courtney seeks to exclude shows that Courtney's reliance on United States v. Redcorn is misplaced.   Whereas the Tenth Circuit in United States v.

Redcorn pointed out that the defendants, rather than investing their money, "could just as easily have decided to blow it on a trip to the Ozarks," 528 F.3d at 739, the promissory notes that Courtney asks the Court to exclude show that Courtney could not have blown his money on whatever he wanted.   He had no choice but to send the proceeds from 4400 Oxbow Trail's sale immediately to Nisolle and Smith, as he was indebted to them, at least in part, for their investment in Vista Studios.   Because the evidence in connection with Smith's loans and with Nisolle's investments in Vista Studios shows that Courtney needed the sale proceeds of 4400 Oxbow Trail to pay off his debts to them -- and quickly -- this evidence that Courtney seeks to exclude in his motions in limine goes beyond a mere desire for money, and is thus the "closer connection to the mechanism of the[] fraud" that the Tenth Circuit found lacking in United States v. Redcorn.   528 F.3d at 739.

        While a desire for money as motivation for an embezzlement scheme may not always have a close enough connection to a motivation to commit wire fraud, this evidence related to Courtney's involvement in Vista Studios investments, and his indebtedness to others which he incurred allegedly for their investments, provides Courtney a specific motive to quickly, and even fraudulently, arrange for 4400 Oxbow Trail's sale.   This motive is thus relevant to the charge that he allegedly committed wire fraud in connection with that sale.   See Fed. R. Evid. 401.   Indeed, the Federal Rules of Evidence specifically contemplate that motive evidence is relevant.   Cf. Fed. R. Evid. 404(b) ("Evidence of a crime, wrong or other act is not admissible to prove a person's character . . . .   This evidence may be admissible for another purpose, such as proving motive . . . ."").   The Court therefore finds that, under rule 401, the evidence related to loans that Smith provided to him, to his investments and others' investments in Vista Studios, and to the use of the sales proceeds from 4400 Oxbow Trail to pay off one of those investors, which Courtney moves

the Court to exclude in his motions in limine, is thus relevant.

II.     **RULE 403 DOES NOT COUNSEL THAT THE COURT SHOULD EXCLUDE THE INFORMATION RELATED TO COURTNEY'S POSSIBLE MOTIVE IN PARTICIPATING IN OR ARRANGING THE FRAUDULENT SALE OF 4400 OXBOW TRAIL, WHICH IS THE BASIS OF THE CRIMINAL CHARGES AGAINST COURTNEY IN COUNTS 1 AND 2, BECAUSE THE INFORMATION IS NOT UNFAIRLY PREJUDICIAL AND WILL LIKELY HELP, RATHER THAN CONFUSE, THE JURY.**

Courtney argues that the Court should nevertheless exclude this motion evidence under rule 403, because the danger of unfair prejudice and of confusing the issues this evidence presents substantially outweighs its probative value.   Specifically, he argues that, "if we start arguing over what was done with these funds, . . . [and] fully delve into all of Mr. Courtney's personal finances and what other funds may have been coming in," then the Court runs the danger of "getting into trials within trials."  Tr. at 16:5-8 (Linnenburger).  The Court concludes that, given that the United States intends to present this evidence to demonstrate Courtney's motivations for 4400 Oxbow Trail's fraudulent sale, and to present how that motivation relates to an overall scheme regarding investment in Vista Studios, the probative value of this evidence is high, and outweighs the minimal unfair prejudice and any danger of confusing the jury.

Courtney points out in his 3rd MIL that, "[i]f the government intends to use these exhibits to present testimony that Defendant may have defaulted on other loans, it is clearly unduly prejudicial and will only inflame the jury."   3rd MIL ¶ 4, at 2-3.   Regardless whether the possibility that Courtney may have defaulted on other loans is "clearly unduly" prejudicial and will serve no other purpose than to "inflame" the jury, the United States does not intend to present any of the evidence related to Smith's loans to Courtney or the investment transactions in which Nisolle was involved to show that Courtney may have defaulted on other loans.   Indeed, Courtney is correct to point out in his 3rd MIL that rule 404 precludes the United States from using the

-25-

evidence for this purpose.   See Fed. R. Evid. 404(b) ("Evidence of a crime, wrong or other act is

not admissible to prove a person's character in order to show that on a particular occasion the

person acted in accordance with the character.").

The United States, however, does not intend to use the evidence to show that Courtney may

have defaulted on loans or participated in "a failed movie studio project" into which "a criminal

investigation was conducted."   5th MIL ¶ 1, at 1.   Rather, the United States intends to use the

evidence about Smith's loans to Courtney, his investments in Vista Studios, Nisolle's investment

in Vista Studios, and the payment of the sales proceeds from 4400 Oxbow Trail to Nisolle, to paint

the picture of the overall scheme in which the United States contends 4400 Oxbow Trail's

fraudulent sale was a component.   Just as rule 404 contemplates motive as grounds for admission

of otherwise impermissible bad-act evidence, it also contemplates this evidence's admissibility to

show a "plan."   Fed. R. Evid. 404 (b).[3]   Rule 404's recognition that, notwithstanding the possible

prejudice that this information presents, the proponent may properly seek admission of the

otherwise prejudicial and inadmissible evidence supports finding that the evidence may be

particularly probative.   And this situation is the case here.   The evidence of Smith's loans to

Courtney, which the 3rd Motion in Limine seeks to exclude, is probative whether 4400 Oxbow

---

[3] It appears that the United States does not intend to offer into evidence that Courtney defaulted on any of these loans to Smith not directly connected to 4400 Oxbow Trail, or that Courtney defaulted on any loans to Vista Studios or to Nisolle.   Thus, because these loans, separate from Courtney's repayment of the loans or failure to repay the loans, does not appear to be a bad act, this evidence on its own does not appear to fall within rule 404(b)'s scope.   Even if, however, this evidence comes under rule 404(b), rule 404(b) does not exclude any of the evidence that Courtney's motions in limine seek to exclude, because the Court concludes that: (i) the United States is offering it for the proper purposes to show motive and plan; (ii) because the motive and plan relate to the sale of 4400 Oxbow Trail, which is the basis for Counts 1 and 2 in the Indictment, it is relevant; (iii) rule 403 does not counsel that the Court exclude the evidence; and (iv) the Court will, if Courtney requests, provide a limiting instruction to the jury under rule 105.   See United States v. Zamora, 222 F.3d at 762 (citing United States v. Roberts, 185 F.3d at 1125).

Trail's sale was fraudulent, given that Smith was the straw buyer of that property.   Similarly, the evidence of Courtney's investments in Vista Studios that Courtney seeks to exclude in his 5th MIL, the evidence that Nisolle invested in Vista Studios at Courtney's behest, and the evidence that she was paid out of the alleged fraudulent sale of 4400 Oxbow Trail for doing so helps the jury understand the United States' contention that 4400 Oxbow Trail's sale was part of a bigger plan, and may help the jury understand why Courtney was not party to the electronic mail transmissions that the 6th MIL seeks to exclude.   The evidence that the 3rd MIL, 5th MIL, and the 6th MIL seek to exclude, therefore, given "its maximum reasonable probative force," appears both particularly probative of the charges that Courtney faces and also particularly helpful to the jury's understanding of the United States' theory of the case.   Deters v. Equifax Credit Info. Servs., Inc., 202 F.3d at 1274 (10th Cir. 2000).

This evidence, especially the way in which the United States intends to use this evidence, given its minimum reasonable prejudicial effect is not, however, very prejudicial.   The Court expects that, setting aside the knowledge that jurors bring with them to the jury panel, there will be ample evidence presented in this case to show that investments in the 2006 through 2007 time frame -- particularly real-estate investments -- went bad.   A number of people defaulted on loans. Perhaps it is because of that assumption that the United States does not mention in its responses to the motions in limine, nor did it mention at the hearing, whether Courtney defaulted on the loans. The United States likely anticipates that the danger of unfair prejudice that presenting evidence about Courtney's possible default on any of these loans, or trying to connect up his investments in Vista Studios with an apparently unfruitful investigation into the studios, may offer in relation to the alleged fraudulent sale of 4400 Oxbow Trail substantially outweighs the minimal probative value this evidence adds when so used.   Instead, the United States intends to provide evidence to

back up its theory of the case: that the fraud which Courtney perpetrated in connection with 4400 Oxbow Trail's sale allegedly to Smith was part of an overall scheme surrounding his involvement investing in Vista Studios.   Used in this way, none of this evidence requires mini-trials to decide whether Courtney paid off Smith's loans or whether the persons heading up Vista Studios engaged in criminal conduct.   Presentation of the evidence that the United States proposes, regardless what happened at the far ends of the transactions, will only help the jury paint the larger picture of the fraudulent scheme in which the United States charges that Courtney was involved -- or at least which he aided and abetted.

The Court therefore concludes that the neither the danger of unfair prejudice in or the danger of confusion of the issues that this evidence presents, when given its minimum reasonable prejudicial and confusing value, and when given its maximum reasonable probative force, substantially outweighs its probative value.   See Deters v. Equifax Credit Info. Servs., Inc., 202 F.3d at 1274 ("In performing the 403 balancing, the court should give the evidence its maximum reasonable probative force and its minimum reasonable prejudicial value.").   The Court will not, therefore, use the extraordinary remedy to preclude wholesale the evidence's admission before trial.   See United States v. Smalls, 605 F.3d at 787 ("[E]xclusion of evidence under Rule 403 that is otherwise admissible under the other rules is an extraordinary remedy and should be used sparingly.").   Accordingly, the Court will deny Courtney's 3rd MIL, 5th MIL, and 6th MIL.

**IT IS ORDERED** that: the Defendant's Third Motion in Limine to Exclude Evidence of Unrelated Loans, filed March 7, 2013 (Doc. 63), is denied; (ii) the Defendant's Fifth Motion in Limine to Exclude Evidence of Vista Studios Investments, filed March 7, 2013 (Doc. 65), is denied; and (iii) the Defendant's Sixth Motion in Limine to Exclude proposed Exhibits 24 and 37 through 40, filed March 7, 2013 (Doc. 66), is denied.

_____
UNITED STATES DISTRICT JUDGE

*Counsel*:

Kenneth J. Gonzales
   Unites States Attorney
Mary L. Higgins
   Assistant United States Attorney
Albuquerque, New Mexico

    *Attorneys for the Plaintiff*

Billy R. Blackburn
Paul Linnenburger
Albuquerque, New Mexico

    *Attorneys for the Defendant*